## JOHN C. NICOLL,
### Elected Judge, November, 1834.

\

## THE STATE, ON THE RELATION OF THE MAYOR AND ALDERMEN OF THE CITY OF SAVANNAH, VS. JOHN I. DEWS.

### *Mandamus.*

An Act of the Legislature of Georgia passed in 1834, appointed the Mayor and Aldermen of Savannah, commissioners of the Jail of Chatham County, with power to appoint a Jailor. The custody of the Jail before the passage of this Act, was vested by law in the Inferior Court and Sheriff of the County. The Corporation of Savannah having appointed the Jailor, D. the then Sheriff who had been elected before the passage of the Act of 1834, refused to deliver the possession of the Jail and the custody of the prisoners therein, on the ground that his term of office had not expired ; that he was entitled by law to the possession of the Jail during such term as incidental to his office, and that the Act of 1834 was unconstitutional, so far as it related to him : *held,* (on application by the Jailor appointed by the Corporation for *Mandamus,* to obtain possession,) that said Act was not the exercise of judicial power, and therefore did not infringe the Constitution of the State, and that it did not violate the Constitution of the United States, by impairing the obligation of a contract; and *Mandamus* granted.

Definition of, and distinction between *legislative* and *judicial* power.

Public officers under our Government, are but the naked agents of the body politic, and act only for its benefit. Such officers have no proprietary interest in their offices, and their duties, and rights which are the mere consequence of such duties, may be changed during their continuance in office, by the Legislature, without violating that clause of the Constitution of the United States, which forbids the passage of a law impairing the obligation of a contract.

A Sheriff in the State of Georgia is entirely a ministerial officer whose province is to execute duties prescribed by law, and which duties may be contracted or enlarged at the will of the Legislature.

Laws passed in the exercise of the ordinary legislative power of a State, are not *contracts* within the purview of the Constitution of the United States.

And laws which repeal or amend them, do not fall beneath the constitutional inhibition.

### By NICOLL, Judge.

IN the year 1791 the Mayor and Aldermen of the city of Savannah were appointed commissioners of the Court House and Jail of Chatham County, (Watk. 433,) and, in 1801, they were vest-

[The State vs. Dews.]

ed " with full power and authority to appoint a Jailor, and such other officers as might be necessary." They continued in the undisputed enjoyment and exercise of this power until after the passage of the Act of 1822 " to confirm certain conveyances of the town common of Savannah, made by the Mayor and Aldermen, and to invest in the Inferior Court and Sheriff of Chatham County the *direction* of the County Court House and Jail," by the second section of which it was, among other things, provided " that from and after the first day of January (then) next, the *direction* of the Court House and Jail of Chatham County, hitherto nnder the superintendance of the corporation of Savannah, shall be vested in the Inferior Court and in the Sheriff under *the general laws regulating County Jails in this State*, and the Mayor and Aldermen shall thenceforth be discharged from the rights and duties of *commissioners* of said Court House and Jail." By an act passed on the 8th December, 1834, under the title of " an Act to repeal' in part the 2d Section of an Act passed on the 21st December, 1822, entitled ' an Act to confirm certain conveyances of the town common of Savannah, made by the Mayor and Aldermen the commissioners of the Jail of said County,'" it is enacted '' that from and after the 1st day of January" then " next, the direction, management and control of the Jail of Chatham County, shall be vested in the Mayor and Aldermen of the City of Savannah and the hamlets thereof, who are hereby constituted the commissioners thereof with all the rights and duties thereto appertaining, with power to them to appoint a Jailor and other necessary officers for a term of years, not exceeding three years."

This Act being passed by the General Assembly of the State, upon which the body politic has conferred " the power to make all laws and ordinances which they shall deem necessary and proper for the good of the State, which shall not be repugnant to the State," it must have effect, unless the exercise of the legislative

[The State vs. Dews.]

power upon the subject be restricted by that Constitution, or by "the supreme law of the land," the Constitution of the United States.

This effect is resisted by the defendant, upon the grounds that he was on the first Monday in January 1834, elected Sheriff of the County, and has been duly commissioned and qualified as such; that by the Constitution and laws of the State, he is entitled to hold and enjoy the office of Sheriff with the rights, privileges, emoluments and fees appertaining thereto for the term of two years, and until his successor shall be qualified: that when he was so elected, commissioned and qualified, the Jail of Chatham County was *by the laws of the State*, attached to and formed part and parcel of said office of Sheriff; and that the custody of the Jail and prisoners therein, with all fees, emoluments and advantages for the keeping of said Jail and prisoners, *by law* did then belong to the Sheriff; that by virtue of said election, of his commission and qualification as Sheriff, he had and still has a vested interest and property in said office of Sheriff, including the custody of said Jail and prisoners, and the fees and emoluments *arising* from such custody of which interest and property he cannot be divested by any Act of the Legislature before the expiration of his term of office; and that the said Act of the General Assembly, *so far* as it enacts that the management, direction and control of the Jail shall be vested in the Mayor and Aldermen during the unexpired term of office of the defendant, is inoperative, null and void.

The objections founded upon these grounds are, 1st, that the Act is the exercise, by the Legislature, of judicial powers, and hence infringes the 1st Sec. of the 1st article of the Constitution of the State; and 2dly, that it is in violation of the inhibition of the Constitution of the United States, against laws impairing the obligation of contracts.

To the ascertainment of the force and applicability of the first objection, it is important to ascertain what is the meaning of legis-

lative, and of judicial power.    Legislative power is that which declares what the law *shall* be; judicial is that which declares what law *is*, and applies it to past transactions and existing cases: the one makes the law, the other expounds and judicially administers it: the one prescribes a rule of civil conduct, the other interprets and enforces it in a case of litigation: the province of the former is *jus dare*, the office of the latter is *jus dicere*. (*Bedford* vs. *Shilling*, 4 S. & R. 411. *Ogden* vs. *Blackledge*, 2 Cranch 272. *Merril* vs. *Sherburne*, Adams N. H. Rep. 203.)

The Act, whose operation is here resisted, does not profess or undertake to declare what the law then was or had been, but is entirely prospective.    It gives existence to a new rule, which, by its own express provision, was to take effect at a day subsequent to its passage.    It is, therefore, not judicial in its character.    Indeed, so far as regards the rights of the defendant, and the question which it is competent for him to raise in the cause, the Act is only in the nature of a repeal of that of 1822; without pretending to avoid or undo what had been done under the former law, and it will not be questioned that the power to repeal a law is purely legislative.

But the objection is not derived from this definition of legislative and judicial power, but assumes as its foundation, that laws which divest private property, are in their nature judicial.    It is not necessary to enquire, whether the principle thus assumed be correct, nor whether the exercise of such power has, by the Constitution, been *attached to the judiciary department*, (the real question involved in the objection,) since its application to this case, is not perceived, and cannot be admitted.

That a public office is the property of him to whom the execution of its duties is entrusted, is repugnant to the institutions of our country, and is at issue with that universal understanding of the community, which is the result of those institutions.    Public officers are, in this country, but the agents of the body politic, con-

stituted to discharge services for the benefit of the people, under laws which the people have prescribed. So far from holding a proprietary interest in their offices, they are but naked agents without an interest. As public agents, they are intrusted with the exercise of a portion of the sovereignty of the people—the *jus publicum*, which is not the subject of grant, and can be neither alienated nor annihilated, and it would be a repugnant absurdity, as incomprehensible as it would be revolting, that they can have a private property in that sovereignty. Unlike those officers in England, whose offices or places are treated as property, they do not hold under *grant*, but their authority or function to discharge the duties of their offices, is *delegated* to them by *commission*. In those instances in which, in England, the right to offices has been regarded as property, the instrument of conveyance has been technically a grant, a conveyance by which an estate is passed or purchased, and employing the technical terms of a grant, *dedi et concessi*. But from the organization of the first republican government of this State, officers have been appointed by *commission*, (M. & C. 9,) a term which, whether regarded according to its ordinary meaning, or its legal sense, imports a delegation of authority, and is defined to be "a delegation by warrant, of an Act of Parliament, or of common law, whereby a jurisdiction, power, or authority, is conferred to others." (4 *Inst.* 163. 3 *H. & Munf.* 31. 43. *Jacobs,* "*Commission.*") And our earliest books draw a distinction between a grant of an office, and a commission, and inform us that the former, as its name implies, is not revocable, but that the latter, which is only the delegation of an authority, is. (*Brooke* 145, pl. 5.) The title exhibited by the defendant himself, in his return, and by which only he can vindicate his possession, (*Bull.* 205. *The King* vs. *Evans* 1 *Show.* 282. *Hand* 57,) is that he has been duly elected Sheriff, and has been duly *commissioned* and qualified. He claims, therefore, not by grant, but under commission, and that commission commits to him only an authority,

without an interest. The title of the defendant is not by a grant which passes an estate, but by a commission, which is a delegation or warrant of authority, and which, so far from passing an estate, is founded upon, and is an affirmance of the fact, that the estate is not in him, but in those from whom the power proceeds. It confers upon him title to exercise the authority, but the subject of that authority is in the principal, and under his control, and the very authority of the agent is evidence of it. Every authority implies a perfect right in the grantor, to the extent of that authority, at least as between him and the agent, and it is perfectly insensible, that because of such agency, the agent becomes armed with a control over the exercise of that right.

But were the title, under which the defendant claims, a grant, and not a commission, it would not constitute the office his property. As property, offices are classed under the head of incorporeal hereditaments, and must be held under a conveyance to a man and his heirs, or at least, a freehold interest must be held in them. (2 *Bl.* 36.) Nor can an action be maintained for any injury resulting from a disturbance or interference with an office, unless it be an incorporeal hereditament, or a freehold; (1 *Ch. Pl.* 133, 4, 144. 1 *Ch. Practice* 221. Comy. Dig. *Assize,* B. 25.) a sure test that property cannot otherwise be had in it, since there can be no right without a remedy. But in this State, where offices are never conveyed to a man and his heirs, they cannot constitute incorporeal hereditaments. Nor is the title which the defendant asserts, of that character. He claims a right to his office for a term of years, a right which, even in England, is not the subject of property, for the obvious reasons, among others, that it cannot be sold or transferred to third persons, be transmitted to one's representatives, nor seized by his creditors. (*Sir George Reynel's* case, 9 Co. 95. 2 *Bl.* 36. *Hardres* 353. *Mead* vs. *Lenthall,* Cro. C. 587.) Chancellor *Kent* says, "In the United States, no public office can properly be termed an hereditament, or a thing capable of being inherited. The Constitution, or the law of the

State, provides for the extent of the duration of the office, which is never more permanent than during good behaviour. *Private* ministerial offices only, can be classed as hereditaments, and I do not know of any such subsisting among us." (3 *Kent* 362, 1st ed.) "The provisions of the ancient common law were remarkably provident in respect to the public interest, and no office of trust, that concerned the administration of justice, could be *granted for a term of years.* This was so ruled by Lord *Coke,* and others, in *Sir George Reynel's* case, respecting the office of the Marshal of the Marshalsea," that is, of the Jailor of the King's Bench Prison. (3 *Kent* 364.)

If reference be had to the Constitution of the State, the language of that instrument equally repels the claim of property set up by the defendant. It provides that "Sheriffs shall be *appointed* in such manner as the General Assembly may, by law, direct, and shall hold their *appointments* for the term of two years, unless sooner removed, by sentence on impeachment, or by the Governor, on the address of two-thirds of the Justices," &c. Now, the term "appoint" is one well known in the law, and whether regarded in its legal acceptation, or its ordinary meaning, is applied to the nomination of an individual, or the constituting of an agent or deputy, but it is never employed to convey an estate. (*Hard.* 46, 47, 353. 5 *Mod.* 386, 12, Id. 399. 2 *Salk.* 467.) A person in whom a power of appointment is vested, may nominate one to whom a conveyance shall be made, but that appointment does not convey the estate. So a Sheriff appoints his deputy, a principal his agent, but in neither instance does the appointment pass an estate, though it confers the right to act as such deputy, in the one instance, and as agent in the other.

That the Sheriff has not a property in his office, derives farther illustration from this section of the Constitution. If the framers of that instrument had designed to vest the office in the Sheriff, as his property, it would not have been consistent with the spirit

which actuated them, in preserving the inviolability of "trial by jury, as heretofore used in the State," that they should declare, that that property should be forfeited in any other manner, than through the judicial administration of the law. Yet the very clause which directs the appointment of the Sheriff, and ordains the term of his service, provides that he may be removed by the Governor, on the address, not of a judicial tribunal, but of two-thirds of the Justices of the Inferior Court, and of the Peace of the County.

It is true, that the appointment of Sheriff confers upon him the right to execute the duties of the office, but from the nature of the office, those duties may be changed by law. It is in this State a purely ministerial office, whose function and province is, to execute duties prescribed by law. From the very nature of such an office, its powers are the result of its duties; in reference to it, the maxim is strictly true, that "power and duty are correlative;" but its powers do not extend beyond, they are the mere consequence of its duties. The holder of such office, has power only to execute its duties, and because such duties are prescribed to, and imposed on him. The idea that the duties of a ministerial officer cannot be changed, will involve an inversion of the order of things, and be a flagrant absurdity; it would invest him, who is a mere minister and servant, with authority to limit the power of, and exercise an over-mastering control over those from whom he is to receive the law. Those duties are the mere creatures of law, and are in their very essence, changeable by the law making power; and his rights, which are derivative only from those duties, cannot prevent their creation or change. His rights, which are the consequence of his duties, cannot intercept the authority of the Legislature to act on those duties.

The appointment of him as well as of other officers, is not a grant in derogation of the rights of the public, but the constituting by the people, in the exercise of their sovereignty, of an agent to carry their sovereignty into effect. In creating an officer the body

politic does not restrict its sovereignty or the powers of the Legislature, through whom that sovereignty is expressed and exercised. The purpose is to extend the sphere of its action, or, at least, to give it operation. But if it be true that the officer has a property in his office, that that property embraces its duties as they were prescribed by law at the moment he was commissioned and qualified, and that those duties cannot be changed without a forbidden disturbance of private property, the consequence is, that by his appointment the officer becomes placed above the sovereignty of the people during the term for which he is elected, and to render the absurdity the more palpable, this would be the case though his function and power are only to execute the duty prescribed to him.

But were it admitted that the Sheriff has a property in his office, this Act would not interfere with that property. That property would consist in his title to exercise the office of Sheriff, in other words, to execute the duties and functions attached to the office. That office he still retains, without any interference with the tenure upon which it was conferred upon him, and, with it, he retains the right to execute the duties which may, from time to time, be appropriated to it; nor can he be deprived of that right. Those duties, which are the mere creatures of law, resulting from the legislative sense of the public interests, are not his private concern, and may be modified, increased or diminished at the pleasure of those in whom the power of legislation resides, and since such increase or diminution does not interfere with his title to the office, nor trench upon his right to execute its duties, his supposed property is not trespassed upon, nor is injury done him. If he sustains loss or incurs a burden in consequence of such alteration of his duties, "it results from the application of those principles by which the public good is to be consulted and promoted," and is *damnum absque injuria.* (*Spring* vs. *Russell*, 7 Greenl. 273, 289, 290. *Charles River Bridge* vs. *Warren Bridge*, 7 Pick. 459, 472. *Lausing* vs. *Smith*, 4 Wend. 9. *Cohen* 146. *Callender* vs. *Marsh*, 1 Pick. 410. *Coates* vs. *Mayor, &c. of New York*,

7 Cow. 585. *Vanderbilt* vs. *Adams*, id. 349. *United States* vs. *the Peggy*, 1 Cranch 103, 110. *People* vs. *Livingston*, 6 Wend. 526. *Allen* vs. *Farrow*, 2 Bailey 587. The *Elsebe*, 5 Robins. 162. *Lewis* vs. *Foster*, Adams 61.)

He is entitled to his office, but it is such as the laws of the land make it, and being an institution of government created for public purposes, exercising unalienable political power for the public benefit, it may be altered or modified by the Legislature as the public good, the interest or happiness of the people may require. The Act in question does not disturb the tenure by which he holds his office, nor interfere with his right to exercise its functions. It simply changes those functions and diminishes his duties and powers by relieving him from the duty, and the power incidental to that duty, of safe keeping prisoners confined in the Jail of the county. In the case of the *People* vs. *Garey*, (6 Cow. 642, 651,) the Supreme Court of New York, speaking of the office of Justice of the Peace, the tenure of which is established by the Constitution of that State, say : " It is not in the power of the Legislature either to extend or shorten the duration of this office. They may enlarge or diminish the territory over which its *powers* are to be exercised. But the office itself exists independently of, and above *them*." The argument urged in this case, that the custody of the Jail is an incident to the office of Sheriff, implies that it is not an essential constituent part of the office, which may therefore exist independently of, and without it, and the admission of that argument, which is also involved in the return, that the Act detaching the Jail from the Sheriffalty, will legally operate upon the future holders of the office, equally concedes it. Nay, the very ground work of the defendant's title would fail him, if the office of Sheriff did not exist independently of the Jail; since, were it otherwise, there could have been no Sheriff in 1822, in whom the Act of that year, upon which he founds his claim, could have vested the direction of the Jail.

[The State vs. Dews.]

Indeed there is an evident and essential difference between power and property, between the power of a corporation or an officer, and the property of each. A grant of property passes from the grantor his entire power over it. A grant of power, (if the expression may be used,) implies that it still resides in the grantor, and excludes all interference with his right to exercise it. An Act enlarging or abridging the duties and powers of an office, does not abolish or interfere with the title to it, but only regulates its exercise; and it is within the perfect competency of the body politic, from which the power emanates, to pass such Act, though it should be true that the title to the office was secured to the holder beyond the reach of legislative action.

An apposite illustration of these views, will readily present itself. The Judge of this Court holds his office by a tenure which the Constitution protects from legislative intrusion, but his duties are necessarily changeable, at the discretion of the law-making power, which in making such change, would in no manner disturb his title. And it must be obvious, since the Sheriff is the ministerial officer of the Court, that such change of its duties, may as much conflict with *his* rights, as does the Act whose operation is now resisted. The principle upon which the validity of this Act is questioned, would, if sustained, deny to the Legislature the power of dividing a County, or creating a new one, since that would transfer from the Sheriff a portion of his authority, duties and emoluments. It would avoid the Act organizing the Court of Common Pleas &c. of the City of Savannah, and other local tribunals, whose jurisdiction being carved out of that of the Courts, of which he is the ministerial officer, necessarily contracts his powers and duties; and would preclude the remodelling of the Chancery jurisdiction of the Superior Court, so as to dispense with the interposition of juries. Indeed it would almost annihilate the powers of ordinary legislation; for what public, general statute is there that may not act upon his duties? And there is scarcely any private one that may not have the same operation. If any personal

privileges or advantages have accrued to the officer, from the institution of the office, they are incidental to the main design, and not the object for which it was created.   And if the end for which it was established, requires alteration in its duties, powers or organization, then the collateral and accidental advantages which the officer derives from its present arrangement, cannot be made permanent to, but must yield to the principal, the public object for which it was established.

And admitting the existence of a contract, as urged in the argument, the right to alter or amend the organization of the office, would be a power reserved to the Legislature, and be an implied condition of the contract.   All contracts, and all laws, must be construed in reference to their main design, and it is thence that their meaning and spirit is deduced.   The object was the public good ; the personal privileges of the officer are a mere accident to it.   *They* must be construed in reference to it, to which they are subsidiary, not paramount ; and since it was established for the public good, they must yield as the public good, the main design, requires, in the apprehension of those to whom its guardianship is committed.   Without the possession of this power, the operations of government would often be obstructed, and society itself be endangered, nor can its exercise be surrendered by the Legislature without an abandonment of their trust and duty.   But the Sheriff is, with us, (unquestionably as relates to the Jail) a ministerial officer, and as such has no power independent of his duties.   The former is accessorial to the latter, and from the very nature of his office, these are not under his control ; they are prescribed to him by some superior, whom he is bound to obey.   It is irreconcilable with the very idea of his office, that he can control that superior, and his right being accessorial to the duty, the latter may be changed without infringing the former.   The right of the Sheriff to the Jail of this County, (if it exists,) results from his duty, and he is entitled to it, because he is charged with the safe-keeping of

prisoners therein. It is correctly called by the counsel for the defendant, a right *incidental* to the office. It is a right which results from, and is the consequence of that duty attached by law to the office. The rights of a ministerial officer flow from his duties, not his duties from his rights. When then, the Sheriff becomes relieved from the duty of the custody of prisoners, the right to the Jail, which is incidental and accessory to it, ceases with it, and with that release from the duty, he becomes released from the correspondent responsibility for the escape of prisoners from Jail, as is the Marshal of the United States, when the State has made it " the *duty* of the keepers of its Jails to receive and safe keep therein, prisoners committed under the authority of the United States." (*Randolph* vs. *Donaldson,* 9 Cr. 76.) The duty is imposed on him by law, and may, of course, be released by law, by the transfer of it, by law, to another. According to the laws of this State, the Sheriff is not answerable for the acts or omissions of any other than himself, and those whom he shall have deputed to execute his duties, but when those duties are detached from his office, and the discharge of them is committed to another, who is not appointed by, responsible to, nor removable by him, his liability, and of course, his duty, ceases. The distinction then, between this case, and that cited in *Milton's* (4 Co. 34) is striking. It was the law of the land, that the Sheriff " should answer for escapes, and should be subject to amercements, if he had not the body in Court, upon process directed to him," " and *therefore,* it would be against all reason that he should be subject to amercement, for not having the bodies of prisoners—and yet another should have the keeping and custody of the Jail;" and such being his responsibility by *law,* he could not be relieved from it by an appointment of Jailor, flowing from the King's prerogative, which " consists" only "in the discretionary power of acting for the public good, where *the positive laws are silent;* (1 *Bl.* 252.) Nor, for the same reason, was it within the sphere of the prerogative to appoint the deputy, for

the positive law, which the King could not dispense with, had provided that the deputy should be appointed by the Sheriff. It was true then, that by the law of the land, the custody of the Jail was attached to the office of Sheriff, and was part of it, and that he could not be deprived of it by the King, whose prerogative was subordinate to the law, and could be exercised only where it was silent. But that case by no means tolerates the idea, that the office could not be controlled by law: on the contrary, the very reason for which the King's grant was void, was that it conflicted with the regulations of law—and the same principle is established by the case of *Harcourt* vs. *Fox*, cited in the argument, and which will be found more fully reported in 1 *Show*.

But the supposition that the office of Sheriff is, in England, an estate or property is not countenanced by *Milton's* case, nor tolerated by the principles of the common law. That case establishes, that the office is held *durante bene placito* and may be determined at the King's pleasure, while also as he is, by St. 9, *Ed. II.* s. 2, appointed for the term of one year, and by commission (*Co. Lit.* 168, a.) he is not vested with an estate in it. The Sheriff therefore has no property in his office in England, and upon the doctrine insisted upon, in behalf of the defendant, that the office of Sheriff here is the same with that in England, it is not his property here.

But it is contended that the Act of December last, is an infringement of the inhibition of the Constitution of the United States, against laws impairing the obligation of contracts.

This is the first instance in which so enlarged a construction has been attempted to be given to that clause of the Constitution, but, as it has been urged with great seriousness, it has been felt due to counsel to give it a deliberate consideration.

According to the theory of our institutions they all spring from contract. In the language of the Declaration of Independence,

" Governments derive their just powers from the consent of the governed." The declaration of rights of Massachusetts proclaims in conformity with the general sense of the people of this country, " that government is a social compact by which the whole people covenant with each citizen and each citizen with the whole people," and the Judges of this State, when deciding the alleviating laws to be unconstitutional, held, that " a law is but a contract between the State and the citizens who compose it, since *all laws* are founded upon the express or implied assent of the governed." If the term " contract," as employed in the Constitution of the United States, be accepted in this comprehensive sense, it is manifest that the independence and sovereignty of the States, on all subjects on which their constitutions and laws have treated, is entirely extinguished ; that they cannot repeal, alter or amend them, and that their sovereignty becomes exhausted and annihilated by the mere effort to bring it into practical existence.

The power of a State upon a subject would become extinct as soon as it should have passed a law in relation to it. Nay more: *the contract of society is not more strongly exhibited in those things upon which positive laws speak than in those upon which they are silent.* As a statute is a contract that the subject which it embraces shall be regulated in the manner it prescribes, it is not less a contract that it shall not be regulated in another or different manner. So also a *statute regulating a subject is equally a contract that other subjects shall not be regulated.* The consent and contract of society was as strong, at the adoption of the Constitution of the United States, upon those subjects on which positive law was silent, as on those upon which it had spoken, and by its very adoption, if laws be contracts within the meaning of the Constitution, the legislative power of the States became annihilated.

Such a construction, then, cannot be admitted, as well because it would prostrate the sovereignty of the States, whose sovereignty is necessary to the existence of the government of the U. States, as be-

cause it would be repugnant to the very section of the Constitution in which this clause is incorporated, and which, by excepting certain subjects from the legislative power of the States, implies the exist-ence of that power in cases not excepted, and where its exercise does not conflict with some other provision of that Constitution.     That Constitution recognizes the existence of legislative power in the States, and by that recognition fortifies it.     Laws then, passed in the exercise of the ordinary legislative power of a State, are not contracts within the purview of the Constitution, nor do laws which repeal or amend them fall beneath the constitutional inhibition.     In the case of *Fletcher* vs. *Peck*, (6 Cr. 135,) Ch. J. *Marshall* says : " The prin-ciple asserted is, that one Legislature is competent to repeal any Act which a former Legislature was competent to pass ; and that one Legislature cannot abridge the powers of a succeeding Legis-lature.     The correctness of this principle, so far as respects gene-ral legislation, can never be controverted."

But the proposition which seems to be implied in the return, and which, it is presumed, is intended to be presented by the argument, is, that at the time " the defendant was elected, commissioned and qualified as Sheriff, the Jail of the county, by the *laws* of the State, was attached to and formed part and parcel of the office of Sheriff, and that the custody of the Jail and prisoners therein, *by law*, did then belong to the Sheriff," and hence any Act of the Legislature which, during the term of his office, should commit that custody to another, would be in violation of a contract with him.

Is the proposition true, that Acts passed during the term for which an individual has been elected to office, altering the duties attached to it at the period of his entrance upon its execution, would violate a contract with him, and be therefore void ?   The effect of such a prin-ciple would be scarcely less extensive or less destructive of the sove-reignty and interests of the people, than would be that, which has been just considered.   Its necessary result would be, that during the term for which an officer has been elected, no law could be passed

in relation to his office, since it must, in some measure, affect his duties. and of consequence, his powers and rights. The sovereign power of the State would therefore be arrested; it would be struck down, during the time for which he was commissioned. And if the principle be correct, in relation to the Sheriff, that because certain duties and rights were attached to his office, at the time he was elected and commissioned, they cannot be changed during his term of office, it must equally apply to every other officer. The proposition involved in the return is a general one, that the duties which appertain to an office cannot be changed within the term for which an individual has been elected to exercise its functions. It comprehends, therefore. all officers, of every character, whether executive, judicial or ministerial, and if the last. *a multo fortiori*, the two former. In fact it would extend to almost every law, and the whole action of government; for laws can be carried into effect, and the operations of government be conducted only through the agency of officers. The consequence of such a principle would be that the legislative power of a State would be suspended, and its ability to remedy public grievances and provide for the common good, and, with these, the sovereignty of the body politic be arrested during the term for which officers were elected. Can a proposition involving such mischievous consequences be seriously maintained? Although private property may be taken for public purposes, when the public exigencies may require, yet no State necessity, no exigency, no public policy, however strong or stringent, will authorise the violation of, or interference with a contract. The Constitution regards a contract as sacred and will not permit it to be impaired for any motive, however powerful, for any cause however imperative. Can it then be possible that that instrument applies to public offices and protects them, from the tonch of legislation, by the guards which it has thrown around contracts? Any legislative Act interfering with them, would be a mere nullity— a dead letter on the statute book. If it embraces public offices, then the institutions of the several States must be unchangeable, and the power to amend them be annihilated.

Indeed with how much more force may it not be objected to such a proposition, that it is not adequate to the Leglslature to grant to an officer privileges which impair or interfere with the powers necessarily and inseparably appertaining to the sovereign legislative power of the State, since it would violate the fundamental compact, the compact of the Constitution?

It is admitted, in argument, that the Legislature may, during the term for which an officer has been elected, abolish the office, or diminish its duties. But neither of these admissions is consistent with the idea of a contract. The abolition of the office would be destructive of the contract, since it would destroy the right secured by it. "Obligation and right are correlative terms;" the obligation of one of the contracting parties is co-extensive with the right of the other, and has no existence independent of that right. If he may, at pleasure, destroy the right, he is under no obligation to yield it; nor can the other have the right, since his right can be only correspondent with the legal obligation of the former. Such an admission is a surrender of the idea of contract.

Now does the other admission more accord with it? A contract is an agreement between two or more persons in which there must be *aggregatio mentium* on the same particular; the mutual concurrence of two or more minds upon one and the same point. It cannot, therefore, be varied in any respect by one without the assent of the other. In the *Dartmouth College* vs. *Woodward*, (4 Wheat. 662–3,) Judge *Washington* asks, "If the assent of all the parties to be bound by a contract be of its essence, how is it possible that a new contract substituted for or engrafted on another, without such assent, should not violate the old contract?" And again, (p. 622,) "Does not every alteration of a contract, however unimportant, even though *it be manifestly for the interest of the party objecting* to it, impair its obligation?" And Ch. J. *Marshall* and Judge *Story* affirm the same principle. (p. 653, 675.)

It is manifest then, and results from the very nature of a contract, that its stipulations and terms cannot be altered by one of the contracting parties, without the assent of the other, even though the alteration be beneficial to the latter.

Such an admission then, is equally an abandonment of the position assumed in the argument And if the admission be applied in practice, an exemplification will be afforded that will be conclusive to every legal apprehension. It is not less incidental to the office of Sheriff to serve writs, that it can be maintained to be, to have the custody of the Jail, and to the unlimited execution of the former duty, he is bound by the express terms of his oath. Yet the statute of the State authorises attachments to be directed to, and served by the Sheriff, his deputy, *or any Constable*, and would, by its own force, relieve the Sheriff from responsibility for nonfeasance, &c. in the execution of such writ, if it should have been placed in the hands of a *Constable*, whom he does not appoint, and who is not responsible to him. He is released from his responsibility by the law—but is it a release from the obligation of a contract? Is it not a release from a legal duty—from a liability resulting from law? The relation then, of an officer to the government, does not sound in contract.

But the admission seems to proceed from a misapprehension of the nature of a ministerial office. It affirms that the duties may be diminished, but cannot be increased, in consistence with the contract. But the rights of a ministerial officer are limited by his duties, and are correspondent to, and co-extensive with them; and they are enlarged or contracted, precisely as those duties are increased or abridged. Now obligation and right being correlative, the obligation of a contract is impaired, when the right secured by it is impaired. The diminution therefore, of such officer's duties, since it would diminish and impair his rights, would, upon the principle assumed, be a violation of the contract.

But if the office may be abolished in the whole, why may it not in part? If it be no infringement of contract to deprive the defendant of the entire office, it is evident that the deprivation of a part would not be obnoxious to constitutional objections, for the whole includes its parts, and is composed of them. If then, it be competent to the Legislature, by abolishing the office of Sheriff, to divest the defendant of his authority, as well as an immediate officer of the Court, as keeper of the Jail, it is not less competent to them to divest him of the latter authority. Yet while this is not contested, while it is admitted that the Legislature may, in harmony with the defendant's rights, and without any violation of the imagined contract, abolish the office, it is denied that they can transfer it to another. Now, the real question is, what are the rights and the obligations of the contract? The right of the defendant under a contract, would be, to hold the office, and that right is infringed, and the contract violated, by his being deprived of the office. To him it is of no import whether another acquires the office or not, unless it be through the means of his divestiture of it. His right is affected by being deprived of the office, not by the appointment of another to it. It is admitted that it is within the power of the Legislature to abolish the office, to repeal the law by which it has been created. But by that repeal the right of the incumbent would cease, and his right having ceased, it would not interfere with his right that the Legislature should *afterwards*, the next day, or the next moment, re-create the office, and confer it on another. Are his rights more affected, because at the *same* moment, the law, which conferred the office upon him is repealed, it is vested in another? If so, the principle resolves itself into an idle mockery, a mere illusion, which a single instant of time suffices to dissipate. The right of the defendant is affected, if at all, by the repeal of the Act of 1822, not by the investing of the Mayor and Aldermen with the appointment of Jailor. The admissions made by counsel, manifest that the idea of the existence, in the case of a contract, within the purview of the Constitution of the United States, does

not approve itself to the mind that suggests it. Nor can it be inferred from the character of the office. It is a public office, of which it is an essential characteristic and property, that its duties and responsibilities may be changed, be added to, or diminished, at the pleasure of the government, without the assent of the officer; and it is doubtless under a sense, and from a recognition of this principle that the admissions are made. It would be irreconcilable with the nature of a contract to suppose that a contract relation subsists between such an officer and the government.

The proposition itself is not consistent with the idea of a contract. It affirms, "that when the defendant was elected, commissioned and qualified, the Jail of the county, *by the laws of the State*, was attached to, and formed part and parcel of the office of Sheriff, and that the custody of the Jail and prisoners, *by law*, did then belong to the Sheriff." The claim then presented by the defendant in his return, and which is the only one that can be considered in the case, does not rest upon grant or contract, but upon *law ;* which, since it is not affirmed in the return to be a grant or contract, was passed by the Legislature, in the exercise of the ordinary powers of legislation, and which, from its very nature, is susceptible of amendment, or repeal, at the pleasure of the Legislature. It would be idle to say, that an Act of the Legislature opposes an obstacle to its repeal by a subsequent Legislature; and the defendant, therefore, admits by the return he makes, the authority of the Legislature to control the powers and advantages he claims.

If the history of the connection of the Sheriff with the Jail be reverted to, it will equally repel the suggestion of a contract. The present defendant, who has succeeded to the situation of *Abram De Lyon*, must hold the custody of the Jail under the same title, by which that Sheriff acquired and held it. But he could not have acquired and held it by contract. The contract, if any there be, which a Sheriff enters into, must be at the commencement of his

PART II.—B. 3.

official term, when he is elected, commissioned and qualified, as stated in the return; but when Mr. *De Lyon* entered upon the discharge of his duties, the Jail was not attached to the Sheriffalty. It was then a duty imposed on him by law, and not the result of contract.

If however, it be said that his contract with the public was, that he would perform whatever duty the Legislature might devolve upon him, then it was a condition of his contract, that his duties might be varied at legislative discretion. And, if according to his contract, they could increase, they could equally diminish the duties of his office. Whence did this condition result? From the cardinal rule in the interpretation of all contracts, that the office must subserve the end for which it was instituted; that being created for the public good, it might be varied, as the public good should require; and not that the will or private interest of the officer, who was employed merely as a means to promote that object, should defeat the end for which it was created. Will it be said that *De Lyon's* acceptance made it a contract? But he could stipulate only for himself, not for his successor, and his private acceptance of the custody of the Jail, could not make it part and parcel of a public office. If it did, then his refusal would have precluded it from becoming a part of the office. It will not be pretended, however, that the then Sheriff could have refused the charge of the Jail, if it was imposed on him by law. Can the present Sheriff refuse to serve a summons of garnishment, issued under the recent Act of the Legislature? And does a duty which, it may be, is imposed *in invitum*, resolve itself into contract?

Nor is the idea of a contract with the defendant, in the spirit of the Constitution of the United States, countenanced by any decision of the tribunal to which, in the last judicial resort, the exposition of that "supreme law of the land" is committed.

The first and leading case on the subject, that of *Fletcher* vs.

*Peck*, draws a distinction, we have seen, between Acts passed in the exercise of legislative power, in the ordinary acceptation of the phrase, and grants of property ; and the other cases in which the question has been presented, directly repel it.

A Sheriff is a public officer, the mere creature of law, created by the sovereign power of the State, for public purposes, connected with the execution of the law, and the administration of justice, as the agent of the body politic, to give effect to its sovereignty, and carry into effect its will. His office is a mere civil institution, established for public political purposes, and may be regulated or changed by society. The mere creature of law, he holds not by contract, and his duties change with the law. The agent of the power of the people, to carry into effect the jurisdiction of the body politic, it would be repugnant to the very idea of his title, that he should control the power and jurisdiction, whose agent he is. In *Fletcher* vs. *Peck*, (6 Cr. 143,) Judge *Johnson* says, "I do not hesitate to declare, that a State does not possess the power of revoking its own *grants*. But I do it on a general principle, on the reason and nature of things: a principle which will impose laws even on the Deity. A contrary opinion can only be maintained upon the ground, that no existing Legislature can abridge the powers of those which will succeed it. To a certain extent this is certainly correct ; but the distinction lies between *power* and interest, the right of *jurisdiction*, and the right of soil. The right of *jurisdiction* is essentially connected to, or rather identified with, the national sovereignty. *To part with it, is to commit a species of political suicide. In fact, a power to produce its own annihilation, is an absurdity in terms. It is a power as utterly incommunicable to a political, as to a natural person.* But it is not so with the *interests* or *property* of a nation. Its possessions nationally, are in no wise necessary to its political existence; they are entirely accidental, and may be parted with in every respect similarly to those of individuals, who compose the community."

In the *Bank of Columbia* vs. *Oakley*, (4 Wh. 236, 244, 5,) the Supreme Court held, that a section of the Charter of incorporation of that Bank, giving to it a summary process by execution, against certain of its debtors, might be altered or repealed by law, and the Chief Justice, by whom their opinion was delivered, says, " We attach no importance to the idea of this being a chartered right of the Bank. It is the remedy, and not the right, and as such, we have no doubt of its being subject to the will of Congress. *The forms of administering justice, and the duties and powers of Courts, as incident to the exercise of a branch of sovereign power, must ever be subject to legislative will, and the power over them is unalienable, so as to bind subsequent Legislatures.*"

And in *Hawkins* vs. *Barney's lessee*, (5Pet. 457, 466, 7,) Judge *Johnson* delivering the unanimous opinion of the Court, says, " It is not to be questioned, that laws limiting the term of *bringing suit*, constitute a part of the *lex fori* of every country : they are laws for administering justice, are of the most sacred and important of sovereign rights, and *a restriction upon which must materially affect both legislative and judicial independence.* It can scarcely be supposed, that Kentucky would have consented to accept a limited and crippled sovereignty, nor is it doing justice to Virginia to believe, that she wished to have reduced Kentucky to a state of vassalage."

After such decided and emphatic expression of the judgment of that tribunal, that powers, such as those attached to the public administrative office of Sheriff, are " incommunicable," and " must ever be subject to the legislative will," and that the parting with them would reduce the State to a condition of " vassalage," it would not only be preposterous to imagine that the Court can have held, that such officer holds his powers by contract, but be almost idle to seek for direct declarations from it, of an opposite opinion. We are, however, not without such declarations of opinion, made, let it be noted, not where it has been controverted, but where it has been assumed as a principle that could not be challenged.

In the discussion and decision of the case of the *Dartmouth College* vs. *Woodward*, (4 Wheat.) it was treated as an axiomatic truth, and assumed as a postulate, that neither a public officer, nor a public corporation, held office or existence under a contract, but under a law; that neither derived property from it; and that the duties and powers of each might be modified and controlled, at the pleasure of the Legislature; and hence the effort there made, and it was the stress of the argument, to shew that a private, unlike a public corporation, or a public officer, held under a contract; that the charter creating it, was not a mere law, but a *grant of property*, which a franchise is, and that for this reason, the Legislature of the State could not interfere with its corporate *franchises;* with the *property* secured to it by the stipulations of its charter.   (Mr. *Webster's* argument, p. 561, 2.)   Mr. *Wirt*, for the defence, contended (p. 611, 2,) that every society has a right to the services of its members, in places of public trust and duty.  Such appointments to offices of public trust, have never been considered as contracts, which the public authority was not competent to rescind or modify. And "Mr. *Hopkinson* in reply, insisted, that the whole argument on the other side, proceeded on an assumption which was not warranted, and could not be maintained.   The corporation created by this charter is called a *public* corporation.   Its members are said to be *public officers*, and agents of the government.   We contend that this charter is a *contract* between the government and the members of the corporation created by it.  It is a *contract*, because it is a *grant* of valuable rights and privileges, and every grant implies a contract not to resume the thing granted.   *Public officers* are not created by *contract or charter*.  They are provided for by general *laws*.   Judges and magistrates do not hold their offices under charters.  These offices are created by *public laws*, for public political purposes, and filled by appointments made in the exercise of political power.   There is nothing like this in the origin of the powers of the plaintiffs; nor is there in their duties, any more than in their origin, any thing which likens them to public politi-

cal agents.   Their duties are such as they themselves have chosen
to assume, in relation to a fund created by private benefaction, for
charitable uses."   (p. 615, 6.)   There can be no doubt, that in
contemplation of law, a charter such as this, is a contract.  It takes
effect only with the assent of those to whom it is granted.   *Laws*
enjoin duties without or against the will of those who are to per-
form them.   But the duties of the trustees, under this charter, are
binding upon them, only because they have accepted the charter,
and assented to its terms."

And Ch. J. *Marshall*, in the opinion which he delivered, dis-
tinctly affirms, that " grants of political power;" that " offices held
within a State for State purposes," "civil institutions adopted for
internal government;" "officers invested with political powers,
partaking in the administration of civil government, and performing
duties flowing from the sovereign authority," or " concerned in the
administration of public duties;" in short, that "public officers"
and "public institutions," are not objects comprehended within the
constitutional inhibition against laws impairing the obligation of
contracts—that " they are controllable by the Legislature," and
that " the laws which concern them must change with circum-
stances, and be modified by ordinary legislation."   (p. 627, 629,
630, 635, 638.)   He says, (p. 627,) " on the first point," (to wit,
that it was a contract protected by the Constitution of the United
States.) " it has been u ged that the word " contract," in its broad-
est sense, would comprehend the political relations between the
government and its citizens, would *extend to offices within a
State for State purposes*, and to many of those laws concerning
civil institutions, which must change with circumstances, and be
modified by ordinary legislation, which deeply concerns the public,
and which, to preserve good government, the public judgment
must control.   That the clause of the Constitution, if construed
in its greatest latitude, would prohibit these laws.   That it would
be an unprofitable and vexatious interference with the internal con-
cerns of a State; would unnecessarily and unwisely embarrass its

Legislature, and render immutable those civil institutions which are established for purposes of internal governm nt, and which, to subserve those purposes, ought to vary with varying circumstances," and then remarks, (p. 629,) "The general correctness of those observations *cannot be controverted :* that the framers of the Constitution did not intend to restrain the States, *in the regulation of their civil institutions, adopted for internal government,* and that the instrument they have given us, is not to be so construed, may be admitted. The provision of the Constitution never has been understood to embrace other contracts than those which respect private property, or some object of value, and confer rights which may be asserted in a Court of Justice." "If the Act of incorporation be a grant of *political power,* if it creates a *civil institution to be employed in the administration of the government,* or if the funds of the College be public property; or if the State of New-Hampshire, as a government, be alone interested in its transactions, the subject is one *in which the Legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States."* (p. 629, 630.) "Had Dr. *Wheelock* employed assistant tutors with the funds contributed by others, or had the trustees in England established a school with Dr. *Wheelock* at its head, and paid salaries to him and his assistants, they would still have been private tutors—and the fact that they were employed in the education of youth, could not have *converted them into public officers,* concerned *in the administration of public duties, or have given the Legislature a right to interfere in the management of the fund."* (p. 635.) "From the fact that a charter of incorporation has been granted, nothing can be inferred which changes the character of the institution, or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the *manner in which they are formed and the objects for which they are created. The right to change them* is not founded on their being incorporated, but *on*

*their being the instruments of government created for its purposes.* The same institutions created for the same objects, though not incorporated, *would be public institutions,* and *of course be controllable by the Legislature.* The incorporating Act neither gives nor prevents the control."

The opinion of Judge *Story* is not less direct and decisive. After having remarked that government has a right to regulate, control and direct public institutions "at its own will and pleasure," (p. 661,) he says: "It is *admitted* that the State Legislatures have power to enlarge, repeal and limit the authorities of public officers, in their official capacities, in all cases when the Constitutions of the States respectively do not prohibit them; and this, among others, for the very reason, that there is *no express or implied contract* that they shall always, during their continuance in office, exercise such authorities. *They are to exercise them only during the good pleasure of the Legislature.* (693, 694.) And again, (p. 700,) "mere naked powers, which are to be exercised for the exclusive benefit of the grantor, are revocable by him for *that very reason.* But it is otherwise when a power is to be exercised in *aid of a right vested in the grantor.* We all know that a power of attorney, forming a part of a security upon an assignment of a chose in action, is not revocable by the grantor. For it then sounds in contract, and is coupled with an interest."

The powers conferred upon a Sheriff are then revocable at the pleasure of the government. No property is granted to him; nothing is, strictly speaking, given to him; nor is power delegated to him in aid of rights vested in him, but for the exclusive benefit of the public by whom it is delegated. He is the mere agent of the public under a naked authority to perform duties prescribed to him by laws—the expressions of the public will, for the public benefit, and all that can be claimed to be granted to him, is the mere authority to be such agent. But such grant is not of property made by the Legislature, in the exercise of a right of dominion

or of proprietary interest, as trustees of the public, for his private benefit; but of political power, for public purposes, and for the common benefit of all, in the exercise of ordinary Legislative power.

He has no interest in the duties whose performance is committed to him, nor in the subjects of them. They therefore may be changed or controlled, without interfering with his interests. Whatever private advantage he has, is in the emoluments which are consequential upon, and derivative from, the actual and precedent execution of those duties. (1 *Bl.* 470, 1. *Ritchie* vs. *Mauro.* 2 Pet. 243. 1 *Cr.* 173.) And if he should sustain loss from the change of those duties, it would be only the consequence of the exercise of an undoubted right of the public, and be, as has been already remarked, *damnum absque injuria.* The office was, (as all public officers with us are,) created for public purposes, and not for the private emolument, or exclusive advantage of the incumbent. The personal advantages he acquires, were not among the objects of its creation, but are only collateral to it, and are incidental to public duties imposed by law, not for his individual benefit, but for the common good, and must, like other privileges, incidental to public laws, yield to such modifications as their principal design may, in the view of those, through whom the public will is expressed, require. To affirm the reverse, would be, to deny that public laws can be annulled or repealed. The authority vested in him, sounds not, as Judge *Story* observes, in contract, and is not fenced around by the sacredness which invests such a security of private right. The duties attached to it, are the mere creatures of law, and the repeal of them, would "divest no vested interest, but be the exercise of a legislative power, which every Legislature possesses." An administrator also, holds an office, with powers over the estate of his intestate, and is entitled to a compensation, consequential upon the exercise of those powers; and previously to the Act of 1805, (*Prin.* 165,) all the personal property of the dece-

PART II.—C. 3.

dent was, by law, subject to his absolute power of disposal. But has it ever been imagined, that unconstitutionality could be predicated of the restriction which that Act imposes upon his powers— or can it be doubted, that it is competent for the Legislature, to divest him of the authority which he now possesses, by law, over the real estate? *The Bank of Hamilton* vs. *Dudley's lessee.* 2 Pet. 492, 523–4. *Rice* vs. *Parkman.* 16 Mass. 326, 331, and other cases, vindicate the legislative competency, and upon the very reason, which the return in this case, would oppose as an obstacle to legislative action, to wit, that the power was conferred on him by law. If the Legislature can change the office, the powers and duties of an administrator, whose trust is of a private character, it surely cannot be questioned, that they may control the duties and powers of a Sheriff, a public officer, who has no interest in the subjects of those powers and duties. And, if they can regulate the authority, and consequential rights, attached to the office of the former, during the term for which he has been appointed, it will not be pretended, that they are foreclosed from the exercise of a like power, over the public interests and business, committed to the administration of the latter, simply because he had, at some previous time, been appointed as agent to manage them. These views are illustrated by, and derive confirmation from, the remarks of Judge *Washington,* in the *Dartmouth College* case. "A civil corporation, (said that Judge,) is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the King's government may bestow upon it, and having no other founder, or visitor, than the King or government, the *fundator incipiens.* It would seem reasonable, that such a corporation may be controlled, and its Constitution altered and amended by the government, in such manner as the public interest may require. Such legislative interferences cannot be said to impair the contract by which the corporation was formed, *because there is in reality but one party to it,* the trustees, or governors of the corporation, being merely the trustees for the public,

the *cestui que trust* of the foundation. The trustees or governors, have no interest, no privileges or immunities, which are violated by such interferences, and can have no more right to complain of them, than an ordinary trustee, who is called upon in a court of Equity, to execute the trust."

The same opinion is announced by the Supreme Court of New Hampshire, in the case of *Merrill* vs. *Sherburne*, (Adams 199–213.) "We wish it to be distinctly understood that Acts of the Legislature are not within the above prohibitions, unless they ope rate on the interests of *individuals* or of *private* corporations. Nor are they within them, when, in an implied or express manner, the parties affected have consented to their passage; *as all public officers impliedly consent to alterations of the institutions in which they officiate, provided the public deem it expedient to introduce a change.*"

Nor is there any dissenting opinion upon the subject among the jurists of our country. Mr *Rawle*, in his "view of the Constitution," says, (131–2,) the prohibition in relation to contracts "does not comprehend the political relations of a government and its citizens; *civil institutions which must be liable to change with circumstances and to be modified by ordinary legislation, those which deeply concern the public* and which to preserve good government the public judgment must control."

It is said by a lawyer of eminence, (*Willard Phillips,*) whose treatise on another branch of the law is among the standard works of our profession, when reviewing the *Dartmouth College* case, "The question was one of great importance, and this depends upon the decision of the question whether they are to be considered public or private corporations, the rights, for instance, of a county town or school, and *so the rights of public officers, as such,* are, in general, subject to prospective modification and control by the State Legislature as far *as those rights arise directly from statutory and not constitutional provisions.* (7 Amer. Jur. 311.)

Chancellor *Kent*, in the 2d vol. of his commentaries 305, 2d ed. states, that " a public corporation instituted for purposes connected with the administration of the government, may be controlled by the Legislature, because such a corporation is not a contract within the purview of the Constitution of the United States. In those public corporations, there is, in reality, but one party, and the trustees or governors of the corporation are merely trustees for the public." A remark equally applicable to all public offices, for all public officers are but trustees and agents for the public.

Judge *Story*, reviewing the decisions which have been made on this clause of the Constitution, says, in the 3d vol. of his commentaries, p. 260 : " There is no doubt as to public corporations which exist only for public purposes, that the Legislature may change, modify, enlarge and restrain them ; with this limitation, however, that *property* held by such corporations, shall still be secured for the use of those for whom and at whose expense it has been acquired. The reason is that *it is only a mode of excrcising the public rights and public powers, for the promotion of the general interest ; and therefore it must from its very nature remain subject to the legislative will*, so always that private rights are not 'infringed or trenched upon." And upon the immediate point in issue here, he thus emphatically expresses himself: " That the framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, is admitted and it has never been so construed. It has always been understood that the contracts spoken of in the Constitution, were those which respected property or some other object of value, and which conferred rights capable of being asserted in a Court of justice."

The proposition asserted by him, that the Constitution is confined to contracts which respect private property, or some object of value, and confer rights capable of being asserted in a Court of justice, and does not embrace civil institutions, adopted for inter-

nal government," " public officers," or other "instruments of government, created for its purposes," is precisely that which we have seen, was maintained in the opinion of the Supreme Court, delivered by Ch. J. *Marshall*, in the *Dartmouth College* case.

This was the view also, of Judge *Chase*, (the ablest *lawyer* on the bench of that court, previously to the accession to it of the present Chief Justice,) of the object and effect of the prohibition, and who, in *Calder* vs. *Bull*, 3 *Dall.* 383, considers such a law only as invalid under this clause of the Constitution, as "impairs the lawful private contracts of citizens," as " violates the right of an antecedent lawful private contract." The same construction is given to it by Judges *Thompson* and *Trimble*, in *Ogden* vs. *Saunders*. (12 *Wheat.* 304, 330, 1,) and the Ch. J. there says, "it comprehends those laws whose operation *consists in their action on individuals*;" (p. 334;) " it relates to the civil transactions of individuals;" (p. 335, 6;) " it contemplates legislative interference with private rights;" (p. 336.) The 44th No. of the *Federalist*, which treats of this clause, advocates it, as designed to fence " private rights, personal rights;" and the Judges of this State, when referring, in the opinion before adverted to, upon the alleviating laws, to the contemporaneous exposition of that instrument for the purpose of ascertaining the spirit of this clause, and to illustrate their own view of it, cite the following argument, from the debates in the Virginia Convention, and it is the only passage invoked by them, from the discussions, which the submission of our present form of government to the people elicited. " If we take a review of the calamities which have befallen our reputation, as a people, we will find they have been produced by frequent interferences of the State with *private contracts*."

The universal sense, then, of the country, in relation to this clause, that in which it was conceived, advocated and adopted— in which it has been invariably insisted upon, and judicially expounded and enforced, is, and ever has been, that public officers, in their official capacities, are excluded from its operation.

Nor do any of the cases, which the industry of the counsel for the defendant, has enabled them to invoke, yield any aid to the supposition, that the authorities, duties and rights, of the public officers of a State, are protected by the Constitution of the United States, from legislative regulation.

If I correctly apprehend the proposition of the Supreme Court, in the case of *Marbury* vs. *Madison*, (1 Cr. 162,) that "when the President has made an appointment, his power over the office is terminated. The right to the office is *then* in the person appointed, and he has the absolute, unconditional power of *accepting* or *rejecting* it;" that before his acceptance, and without his assent, his right to the office is complete, and the other party cannot retract the tender of it; it infers that a public officer does *not hold by contract*. And neither in that case, nor in any of the cases cited from the *South Carolina* Reports, is any allusion whatever made to the existence of a contract; an omission which is scarcely reconcilable with the belief, that those who participated in the discussion or decision of them, considered it as connected with the title of the claimants to office, and which affords by *strong, if not necessary* implication, evidence, that in their judgment, public offices are not held by contract.

The cases of *Gibbs*, (1 Dess. 587,) of *Lyles*, (1 McCord's Reports 238,) and of *Hutson*, (Id. 240,) maintain, that Masters in Chancery and Ordinaries, are judicial officers, who, by the *Constitution of the State*, hold their offices during good behaviour, and that an attempt, whether by the Governor or the Legislature, "to alter the tenure of their offices, could not prevail," because repugnant "to a constitutional provision, fixing the tenure of such offices." That of the *State* vs. *M'Clintock*, (1 McC. Reports 245,) is to the same effect: that "the framers of the Constitution have ordained the fixed and determinate time" of four years, "for which Sheriffs' should hold their offices," and that that time could not be abridged by the Legislature, inasmuch as an Act to that effect would violate "the provision of the Constitution, as it relates to the term of office."

This is the ground on which those decisions are founded: they are utterly silent as to the obligation of contracts being impaired; a silence the more remarkable, as the very clause of the Constitution of the United States, which is objected to the Act of the Legislature in this instance, is incorporated into the Constitution of South Carolina.

The cases adduced from the reported decisions of that State, are limited to legislative and executive Acts, which conflict with the tenure of office, as established by the Constitution of the State, but in relation to the principle involved in this controversy, to wit, the power of the Legislature *to control the duties of a Sheriff*, or other public officer, her tribunals treat it as one which they cannot imagine can be questioned. In Lining's case, adverted to in the argument, the Court of Appeals demands, "has not the Legislature a right to prescribe to a public officer the duties he shall perform, and to make any requisitions of his time that it pleases? It has, by various Acts, reduced the fees of many of the public officers, and it has increased the labors of some, so as indirectly, by increasing their expenses, to diminish their salaries. But those Acts are not therefore, invalid, although they affect the rights of office, much more directly than the Act under consideration." (3 Dess. 479, 80.) In the case of the Treasurer vs. Taylor, (2 Bailey 524,) Judge Martin, whose opinion is affirmed and adopted by the Appelate Court, say, "It would seem indisputable, that the Legislature has the right to regulate the execution of the duties, which are incident to the office of Sheriff, and to demand an indemnity for their faithful discharge. If it be not so, then it necessarily follows, that since the Sheriff is in office under the Constitution, he could be bound to perform only such duties as had been prescribed before the Constitution, and all legislation since has been idle, and worse than idle. No one, I presume, would contend for positions, which they were sensible would lead to such consequences. The Constitution fixes the tenure of the office; but the Sheriff takes it

*sub modo.* He accepts it subject from its very nature, to legislative regulations and to the control of the supreme power of the State," (p. 526–7.) And the Court of Appeals express themselves with yet stronger emphasis. "The Constitution (say they) no where provides for the mode of appointment, duties or qualifications of Sheriffs; and, by necessary implication, leaves the matters, as they then existed, *subject to such modifications* as the Legislature should, from time to time, find expedient."

The principles here adjudicated apply with all their force to the case under consideration. The Constitution of this State establishes the tenure of the office of Sheriff, but imposes no other limitation upon the power of legislation in relation to it. It is silent as to his duties, and submits them therefore to the direction and control of that department of the government, which is invested with the power of making all laws which are not repugnant to that instrument.

And upon this point the case of *Hoke* vs. *Henderson*, introduced into the argument from 4 Devereux, is not less decisive. The Court there say, (p. 14,) that the power of regulating and prescribing "the nature of the office, in duties, powers, privileges and emoluments" is "purely legislative," and "within the legitimate powers of the General Assembly :" that "prescribing the duties of officers, their qualifications, their fees, their powers, and the con sequences of a breach of duty, including punishment and removal, are all political regulations, and fall within the legislative province." (p. 15.) "If the Legislature increase his duties and responsibilities, or diminish his emoluments, he must submit, except in those instances in which the Constitution itself has declared the duty and fixed the compensation, because in the nature of things these are the subjects of such regulations, as the general welfare may, from time to time, dictate, and the office must therefore, have been conferred and accepted, subject to such regulations. (p. 20.)

The current of authority, then, is unbroken and unvarying, that

a public office is not held by contract, within the sense of that term, as employed in the Constitution, and that it is an appropriate exercise of legislative power, and within legislative competency, to reform the office, and change and modify its duties at pleasure, unless the Constitution of the State shall, by an express provision, have fixed that duty.

There is no such provision in the Constitution of this State.

But it is said, that the word "Sheriff," is known to, and derived from the laws of England, and that by its adoption into our Constitution, the nature and character, the powers, duties and rights of that office, as it existed under those laws, became fixed and established, by the fundamental law of the State, beyond the reach of legislative alteration, and that as by the common law, and the statutes 14 *Edward* III. c. 10, and 19 *Henry* VII. c. 10, the Sheriff has the custody and keeping of the Jail, and of the prisoners therein, that custody is by the Constitution, embraced in the office of Sheriff, and cannot be separated from it by legislative Act.

If the premises assumed be, that the term "Sheriff" has been introduced into our Constitution, according to its strict etymological sense, and as importing what it originally signified at common law, "the keeper of the county," with the authorities and dignities attached to the station, as the associate of the King, the chief executive and military officer of the county, invested also with high judicial powers, whose office was purely honorary, and whose duties were gratuitously discharged, it must be obvious that they are incorrect, if in fact, they be not repugnant to the genius of our institutions: while also, it must be equally apparent, that by parity of reason, Justices of the Peace will be protected, by constitutional safeguard, in the same tenure, jurisdiction, powers and incidents, which belong to those officers, in the country from which the Constitution has derived their designation. And the reason why

PART II.—D. 3.

the corollary deduced from these premises is untrue, will furnish an answer to the argument that has been built upon them. It is, that they are officers created by law, whose duties, powers, and responsibilities, are, and always have been, regulated and controlled by law.

But if the proposition presented by the argument, be correct; if it be true, that the office is established and fixed by our Constitution, precisely as it exists in England, all notion of a contract between the Sheriff and the government, or body politic, becomes at once exploded. The acceptance of the office of Sheriff, is not a matter of choice in England; it is imposed upon him under a penalty, (*Watson* 5,) and the Supreme Court have held, in the *United States* vs. *Tingey*, (5 Pet. 115,) under *circumstances* less partaking of the character of duress, that the agreement of an officer was not a contract, because not resulting from the exercise of free agency. And even the statute of 9 *Ed.*, upon which the defendant founds his claim to the Jail, imposed a burden and responsibility upon the Sheriff, and was not intended to confer, and from the nature of the office in England, could not confer a benefit upon him.

If, moreover, the proposition be true, it may well admit of doubt, whether the defendant possesses the qualifications required by the common law, and has a right to contest the claim of the relators.

If it be true, has he complied with the duty which the laws of England impose upon him, under penalty, of appointing his under Sheriff, and the requisite number of deputies and baliffs?

But serious as would be the consequences to the defendant, which would result from this proposition, they would be much more mischievous in their effects upon society. The administration of justice, the pursuit of rights, and the redress of wrongs; all laws which are administered through judicial tribunals, all which relate to property, to contracts, or persons; and these form the great mass of the laws of every civilized community; the whole

criminal jurisprudence of the country, and every thing connected with the enforcement of civil rights, require the agency of the office of Sheriff in England, or of an officer of like nature and character, in every country where laws and courts of judicature are known—and are, therefore, immediately connected with his powers and duties. If then, the powers and duties of the Sheriff, as they exist in England, are surrounded by the impregnable safe-guard of the Constitution, the laws of that country, almost in their totality, have been inflexibly fixed upon us; they cannot be changed, since any change in them, must affect the Sheriff in his powers or duties, his rights or resposibilities, and make them different from what they were in England, at the period of the establishment of our Constitution; and the framers of it, when ordaining a government, in which they embodied the representative principle, in order that it might reflect the sentiments of the community, and with the distinct design, that the political society, which they were organizing, should advance with the advancement of the age, and accommodate itself to the improvements of society, have, with the iron hand of an imbruted despotism, stamped inflexible immutability upon our institutions; have bound us to the notions of our ancestors, no matter how exploded by the sentiments of society, or inconsistent with its interests; and not merely limited, but abolished the power of the Legislature, in the very effort to organize it. The proposition is too monstrous to be for a moment entertained.

If it be true; the contemporaries of the Constitution and those who, themselves, had an agency in framing it, have betrayed a lamentable ignorance, or been guilty of a wanton disregard of its provisions, by divesting the Sheriff of the high judicial and executive powers which belonged to him in England and degrading him to the performance of unmixed ministerial services; by transferring from him the authority of presiding at elections and imposing on him the duty of attending them as a mere police officer, subject to the orders of others who preside; by depriving him of the im-

portant privilege of selecting jurors; by admitting constables, not of his nomination, to participate with him in the service of writs; by all the regulations in relation to Sheriff's sales, and. by the inforcing upon him of the duties of humanity towards prisoners whom the common law allowed "in the name of God" to starve, if they could not support themselves; by requiring from him a bond, as a prerequisite to the discharge of his duties, and by numberless other interferences with his powers and privileges; nay, by the Judiciary Act itself, passed almost simultaneously with the Constitution, and whose provisions the defendant invokes in support of his claim;—and not only by the Acts which have direct reference to his office, but also by all those which regulate Courts and their proceedings. If there be any thing attached to the office that can be regarded as the private right of the officer, it is his emoluments and fees. But will it be pretended that the Legislature have been guilty of desecration of the Constitution by reducing the enormous costs that attend the prosecution of a suit at law in England, and which would, if retained among us, amount almost to a denial of justice? Yet such a proposition, if not more tenable, would not be less so than that which is contended for.

It is much more reasonable to believe that the framers of the Constitution had in view the office as it then existed in this State, where many and material alterations have been effected in its nature and character. But even viewed in this modified aspect, the proposition insisted on would involve the same mischievous consequences which have just been indicated. It would deny to the Legislature the right to regulate the administration of justice—to change the organization of Courts—to amend the laws which regulate property, respect contracts, or which affect civil rights. It would abolish all changes that have been made in any of these respects since the establishment of the Constitution, would restore the civil institutions which then existed, and towards the reforming of which the Constitution itself was remodelled, and render

them immutable by the power of legislation which it for that purpose organized. Of its effect the argument presented in the case will afford apposite and strong illustrations. It is maintained that to the Sheriff belongs the custody of persons arrested for debt or for criminal offences, and that, inasmuch as the Jail is the place where they are to be confined, the custody of the Jail appertains to him. Now if it be true that the depriving him of the custody of debtors and of criminals be unconstitutional, as is insisted, the consequence is, that the improvements in penal jurisprudence and in the laws having in view the mitigation or abolishment of imprisonment for debt, so creditable to the humanity and intelligence of the age, are void, because interfering with the rights of an officer, created too for the very purpose of aiding in effectuating the law and for his benefit, we must be remitted to the barbarism of feudality. The law establishing the Penitentiary would be unconstitutional, because to the Sheriff belongs the custody of criminals. The Act for the relief of honest debtors is void, because he is entitled to the custody of persons arrested for debt. So, in like manner, the organization of city and other local Courts is an infringement of his constitutional rights, since to the Sheriff belongs the execution of writs; as for the same reason are laws which confer upon constables the authority to serve attachments and other process.

But in the making of such laws the Legislature is, we have seen, in the exercise of powers which cannot be surrendered, and which are essential to the protection of rights that cannot be alienated. The powers as whose agent he is employed, are the essential powers of government, and the rights in whose enforcement he is engaged, are those for the securing of which, government was instituted. It would be destructive of the very object of government and subversive of its ends that he, who is employed as such agent, should, because of the very duties which inhere in and result from such agency, control those powers and defeat those rights. It

would be a forfeiture of self-government and a substitution of the authority of the agent of the people for that of the sovereign people.

Besides this, the duties which belong to his office are purely ministerial—they are the mere creatures of law, and are imposed upon him by law, and " from the very nature of things," as remarked by the Supreme Court of *North Carolina*, they must be subject to be modified and controlled by law. His powers, as already observed, are the consequences of his duties, his rights result from his obligations, and it would be repugnant to the very nature of his office that he, whose duty it is to receive the rule, should, because of his obligation to obey it, impose restraints upon those from whom he is to receive it.

The framers of the Constitution, when they employed the term, necessarily contemplated the officer whom it designated, in the light in which he was known to the institutions of the State. These recognised him as a purely ministerial officer, whose duty it was to obey the injunctions, and execute the prescriptions of law, and under them his powers had always been regulated by law, unrestrained by any direct constitutional provision. The employment of the term in the Constitution, therefore, so far from relieving his duties from the control of the Legislature, imports their subjection to the legislative will, and would leave them, did it impose no other restraint, to the unlimited action of that will. Ours is a government founded upon the public will: and the representative form in which it is organized, is designed to reflect and embody that will. Laws are, therefore, with us, emphatically, " the public will duly expressed," and when it is confined to its constituted ends, there is nothing that can hinder it from operating on its appointed agents.

But the term, from which a restraint upon the power of legislation is attempted to be denied, does not impose a limit upon the

*ends* for which government is constituted, but on the contrary, is used in reference to an *agent*, a means to accomplish those ends.

Now the only limit which the Constitution imposes upon the Legislature, in relation to the office of Sheriff, is as to the tenure by which it shall be held. It is silent as to his qualifications and *duties*, and of necessity, leaves them, as remarked by the Court of Appeals, of South Carolina, to the control of the Legislature. And the insertion of this provision into the Constitution, by which bounds are imposed upon the Legislature, in respect to the direction of the office, bears evidence, by necessary implication, that, but for its introduction, the legislative will, in regard to the office, would in this respect, as in all others, have remained unrestrained. And a recurrence to precedent legislation on the subject, will tend to establish that this was the object of the provision.

If the provision of the Constitution were of equivocal import, the practical construction that has been given to it, and the uninterrupted usage under it, would remove all doubt. The legislative interferences with the office, the duties and rights of Sheriff, before adverted to, commencing almost at the moment the Constitution went into effect, and unintermittedly exercised ever since, and among these interferences, that, above all others, by which the regulation and custody of this very Jail were transferred, as early as the year 1801, to the relators and their appointers, and continued in them, without resistance, or being questioned, until revoked by the Act of 1822, conclusively evince the sense in which it was adopted, and has been accepted by the people, whose Act it is; and establish the universal understanding, that the control of the office, and of the authorities, duties and rights of the holders of it, is subject to legislative discretion.

But the Constitution itself forbids the indulgence of a doubt.

A Constitution is designed to organize the political government of society, and the very comprehending of the office of Sheriff, in

that fundamental law of the body politic, is a recognition of it as a public office, established for political purposes, and to subserve the ends for which the government was established.  The duties of such an office are, from their very nature, subject to be abridged and controlled, as the general welfare, the common good, and the happiness of society may require, and they may therefore, be modified, at the pleasure of that department which is the exponent of the public will, so long as its action is confined to the ends for which government was constituted.  As principle, and the nature of the office establish, so all authority proclaims, that the duties of a public officer may be diminished or increased at the pleasure of the government.  In the language of Ch. J. *Marshall*, a public officer is " an instrument of government, created for its purposes," an agent " for the performing of duties flowing from the sovereign authority," " exercising powers conferred by the government for public objects," holding " an office created for state purposes," " and must of course, be controllable by the Legislature."

He is an instrument for public purposes—an agent for the performance of public duties.  But public purposes must be such as the public appoints and can control, and public duties must be for the benefit and therefore under the direction of the public.  They would cease to be public if they were subjected to the control of the individual whose instrumentality was employed for their attainment or execution.  He is appointed as a means for the effecting of an end, and must be controlled as that end requires.  Were it otherwise the end would be sacrificed to the means.

And regarding him as a mere ministerial officer, he has no powers beyond, or independent of, his duties.  Powers become vested in him, we have seen, because of the duties that are imposed on him, and are accessorial to the latter.  His powers and rights are incidental to his duties, and the remark of the defendant's counsel is rightly conceived, which affirms that his right to the keeping of the Jail is *incidental* to the office.  But in the duties to which that

right and power are incident, he has no interest. They may be changed without an injury to his rights. Those rights are collateral to, and consequential upon duties, which are entirely under the control of the public, and he cannot more justly complain of a consequential loss that he has sustained from the exercise of that undoubted right of control over his duties, than could an owner of property, of damage resulting to him from the exercise by the public of their unquestionable rights in relation to the establishment or alteration of highways, or the improvement of navigable streams; or, than could the owners of lots on the river or in the former seats of business within the city, legally resist the authority of the Legislature to incorporate the Steam Boat Company.

Since then, the right to the custody of the Jail is incidental to the office of Sheriff, because incidental to the duty of safe-keeping prisoners, and since that duty may be withdrawn from him by the Legislature, in the exercise of their legitimate and appropriate power, a consideration of the question so fully discussed at the bar, becomes unnecessary. For if the right be incidental to the duty, over which the Legislature has an unquestionable control, the loss of the right has been the effect of a legal exercise of legitimate power, which it would be a solecism to say, the defendant can legally resist. And if, as is insisted by the relators, the right which he claims has not been attached to the office, then he has not incurred even loss from that exercise of power; he has sustained neither damage nor injury.

With the authority of the principal, that of the Jailor, who is his deputy, or appointee, and mere "shadow," also ceases. (3 Kent 365, 6. Earl of Shrewsbury's case, 9 Co. 42. 48. Paddock vs. Cameron, 8 Cowen 212.)

Although this examination of the Constitution has been felt due to the argument, which has been addressed to the Court, it was not required by the record in the case. The return, which alone presents the title upon which the defendant can contest the claim of

PART II.—E. 3.

the relators, does not advert to the Constitution, nor to contracts, as the source of his right to the Jail, but correctly deduces it exclusively from the laws of the State, and claims the advantages and property, which it alleges to be attached to the office, not as secured to the office so long as it shall endure, as they would be were they attached to it, or protected by constitutional provision—but as secured to him during his current term of office, because they were attached to it by *laws* existing at the time he was elected, commissioned, and qualified. But the fact that his title was derived from law, established that it might be revoked by law : and the argument itself, which asserts the unconstitutionality of the Act of 1834, and that it is hence inoperative on the present Sheriff, abandons the ground on which it is based, when it admits, that it may have operation on his successor.

Indeed, the facts of the case, so far as the rights of the defendant are concerned, are simply these:—The Act of 1801 had conferred the control of the Jail, and the appointment of the keeper, upon the Mayor and Aldermen. That of 1822 vested the direction of the Jail in the Inferior Court and Sheriff of the County, and the Act of 1834 repeals that of 1822. The power to repeal a law, it will not be contested, is purely legislative, and its exercise in this instance, since it is not retrospective, and does not avoid or undo what had been done under the pre-existing law, is a legitimate exercise of that power.

The Act of 1834, therefore, being passed in virtue of powers vested in the Legislature, containing in itself no provision repugnant to the Constitution of the State, and not being intercepted by any impediment arising from the Constitution of the United States, must have effect.

The rule granted in this case, must therefore, be absolute, and a peremptory mandamus must issue.